**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| PAULA BOLYARD, | ) | |
| | ) | CASE NO.    5:08-cv-1810 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Paula Bolyard ("Bolyard"), challenges the final decision of the

Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying

Bolyard's applications for a period of Disability Insurance Benefits ("DIB") under Title II

of the Social Security Act, 42 U.S.C. §§ 416(i).  This court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. §

636(c)(2).

For the reasons set forth below, this court remands the case to the ALJ for

further proceedings consistent with this opinion.

I.  Procedural History

Bolyard filed an application for DIB on January 7, 2004, alleging disability as of

May 2, 1997 due to migraine headaches and the side effects of her medications.  Her application was denied initially and upon reconsideration.  Bolyard timely requested an administrative hearing.

Administrative Law Judge Jeffrey J. Griesheimer ("ALJ") held a hearing on May 21, 2007.  Bolyard was represented by counsel at the hearing, and she testified on her own behalf.  No medical expert ("ME") or vocational expert ("VE") testified at the hearing.  The ALJ issued a decision on August 2, 2007 in which he determined that Bolyard was not disabled as of June 30, 2001, Bolyard's last insured date.  Bolyard requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on June 5, 2008, the ALJ's decision became the final decision of the Commissioner.

Bolyard filed an appeal to this court on July 28, 2008.  Bolyard alleges that the ALJ erred by (1) finding that home schooling required significant responsibilities of the home parent; (2) finding Bolyard not credible; (3) ignoring the side effects of her medications; (4) not having an ME assist in the analysis of Bolyard's medical conditions to determine their severity and her credibility; (5) not deferring to the notes of treating physicians; and (6) not seeking the testimony of a VE to opine in view of Bolyard's nonexertional impairments.  The Commissioner denies that the ALJ erred.

II.  Evidence

A.    *Personal and Vocational Evidence*

Bolyard was born on December 9, 1963.  She has an associate's degree in Marketing and has relevant work experience as a receptionist/secretary.

2

B.     Medical Evidence

Roy Dennis, D.C., referred Bolyard to Thomas E. Gretter, M.D., for a consultation on October 4, 1991.  Transcript ("Tr."), p. 331-32.  Bolyard told Dr. Gretter that she has a family history of headaches and that she has suffered from several kinds of headaches beginning at age 12  Her primary complaint, however, was migraine headaches that she described as occurring twice a month and lasting from several hours to two days.  Bolyard described these headaches as beginning on one side of the head or the other and developing into a throbbing, whole head headache.  According to Bolyard, these headaches were accompanied by nausea and vomiting; were associated with menses; and were triggered by caffeine, chocolate, stress, alcohol, and odors.  Bolyard described one of her other headaches as a "partial migraine" that began behind an eye.  Dr. Gretter provisionally diagnosed migraine and tension headaches and prescribed Anaprox.  He also refilled Bolyard's prescription for Tylenol with codeine.

On December 11, 1991, Dr. Gretter switched Bolyard to Sinequan and Indocin as headaches increased in severity and frequency.  Tr. at 333-34.  He also opined that Bolyard was suffering from both migraines and rebound headaches.  A month later, Bolyard reported that her daily headaches had greatly improved but that she had suffered three major headaches in the past month.  Dr. Gretter prescribed Toroidal and Cafergot and added codeine to her Fiorinal.  By mid-May 1992, Bolyard reported that she was experiencing three weeks of minor headaches followed by a week of bad headaches.  Tr. at 336.  Dr. Gretter continued to adjust Bolyard's medications through November 1992.  Tr. at 337-38.

On August 14, 1996, Bolyard began a course of treatment with David Gutlove,

3

M.D., a pain management specialist.  Tr. at 132-36.  Dr. Gutlove planned to give her a series of ten occipital nerve blocks administered every two to three weeks.  Dr. Gutlove also administered trigger point injections.  The treatments gave her substantial relief at first, and Dr. Gutlove discontinue the Relafen that Bolyard has been taking.  By January of 1997, however, Bolyard reported that the treatments were relieving her pain for only three or four days at a time.  Dr. Gutlove discontinued the treatments and prescribed Sansert instead.  When she returned to Dr. Gutlove on February 25, 1997, Bolyard reported that the Sansert was helping a great deal but that she had recently experienced a tension headache.  At Bolyard's request, Dr. Gutlove gave her the last of the ten occipital nerve blocks.  The doctor added Skelexin to Bolyard's drug regimen on April 24, 1997 when Bolyard complained of an increasing tension component of her headaches.

Dr. Gutlove administered an occipital nerve blocks to Bolyard on June 19, 1997 and June 27, 1997.  Tr. at 137-40.  Bolyard reported that she had suffered no migraine headaches since beginning Sansert and that this was the best she had felt in twenty years.  Dr. Gutlove withdrew Bolyard from Sansert for a three-week "drug holiday" on July 24, 1997, and returned her to Sansert on about August 11, 1997.  Tr. at 141-42, 143-44.  Bolyard reported that the three week drug holiday was quite difficult but that she had marked improvement after being returned to Sansert.  He recommended that Bolyard continue the cycle of six months on Sansert followed by three weeks off as long as liver and renal function were normal.  On October 24, 1997, Bolyard reported that her migraine headaches were almost completely resolved since she had been on Sansert but that she continued to experience chronic, severe tension headaches.  Tr. at 147.

4

The attending physician, Mark Workman, M.D., a pain management specialist, had no further options to recommend.

On December 12, 1997, Bolyard visited Selwyn-Lloyd McPherson, M.D., at the Selson Clinic for a neurological evaluation.  Tr. 247-48.  Bolyard reported that her migraine headaches were fairly well controlled on Sansert.  She also reported, however, that she suffered from headaches lasting most of the day two to three times a week.  These headaches were aggravated by menstration, certain foods, and stress and were accompanied by nausea, vomiting, throbbing, and watering of the eyes.  She also complained of inadequate sleep.  Bolyard was then taking Sansert, Elavil, Claritin D, and Imitrex.  Dr. McPherson added Tofranil to aid sleep.

Bolyard continued treatment with Dr. McPherson through June 1, 1999.  Tr. 233-46.  Dr. McPherson diagnosed Bolyard as dysthymic and made various adjustments to her medication regimen.  By mid-March 1999, she was having her drug holiday from Sansert and was prescribed Prozac, Fiorinal, and Ultram.  Bolyard had shown some improvement, but she had continued headaches and displayed little interest in life.

On May 11, 1999, Bolyard reported to Dr. McPherson that she had experienced a seizure while on vacation in Mexico.  Tr. at 236-37.  Dr. McPherson initially ascribed this to hypoglycemia following the drinking of three margaritas the night before.  Bolyard also reported that she had daily headaches of 8 on a 10-point pain scale.  Dr. McPherson scheduled an MRI and EEG.

On June 1, 1999, Dr. McPherson noted that Bolyard had experienced two more seizures.  Tr. at 233-34.  He noted that He noted that Bolyard's sleep-deprived EEG was suggestive of left temporal seizures, and he continued to attribute the seizures to

5

alcohol withdrawal.  He continued Prozac, Sansert, Allegra, Mellatonin, and Neurontin.

Bolyard visited Norman Lefkovitz, M.D., a neurologist, on June 15, 1999, after experiencing three seizures within a month.  Tr. 154-167.  He noted that Bolyard's recent MRI and an EEG revealed no abnormalities, but that her sleep-deprived EEG revealed occasional spikes in the left temporal region.  Dr. Lefkovitz opined that Bolyard's seizures were the product of medication interactions, particularly Ultram and Prozac.  He prescribed Depakote in place of Neurontin.  Dr. Lefkovitz treated Bolyard through November 2000.

On October 30, 2001, Bolyard visited Howard Shapiro, M.D., at the request of Bolyard's family physician, Philip N. Gilcrest, M.D..  Tr. 168-69.  He noted that Bolyard had been free from seizures since taking prescribed medication.  Dr. Shapiro opined that Bolyard's three seizures had been the result of the medications she was taking.  He also believed that at least some of Bolyard's headaches were caused by her headache medications themselves and that she needed to be withdrawn from medications and consider non-pharmacological treatment with Dr. Moshe Torem.

Bolyard consulted with Jennifer S. Kriegler, M.D., Director of the American Migraine Center, on March 11. 2002.  Tr. at 170-72.  Bolyard complained of daily headaches lasting from two hours to several days.  About eight of these headaches per month are migraines.  Bolyard described her migraines as associated with her period, exercise, stress, alcohol, odors, cigarette smoke, temperature changes, and bright lights, especially sunlight.  She also said they were accompanied by photophobia, osmophobia, nausea, and vomiting and that they moderately to severely impacted her home activities and job performance.  Bolyard had tried Amitriptyline, beta blockers,

6

Cafergot, calcium channel blockers, DHE 45, Depakote, Esgic, Fiorinal, Imitrex, Indocin, and other medications.  Her then-current medications included Imititrex and Imitrex injections, Excedrin, Depakote, and Pamelor.  Dr. Kriegler recommended discontinuation of most medications to test the possibility that Bolyard's headaches are rebound headaches.

Wadsworth-Rittman Hospital admitted Bolyard for treatment for loose, bloody stool on August 15, 2002.  Tr. at 173-87.  A colonoscopy revealed ischemic colitis, probably induced by medications.  The hospital released her on August 17, 2002.

Bolyard underwent treatment at the American Migraine Center from November 12, 2002 through March 29, 2004.  During this period, she complained of daily headaches treated five to seven days a week with Imitrex.  Tr. at 191.   She was prescribed Topomax, Alegra, and Migronal and was warned against use of Imitrex despite its effectiveness.  Tr. at 196, 200, 203.  In March 2003, she complained of neck spasms, and the treating physician detected trigger points in her neck and trapezius. Tr. at 208-09.

In January 2004, Dr. Gilcrest completed an assessment of Bolyard at the request of the Bureau.  Tr. at 229-31.  Dr. Gilcrest diagnosed Bolyard as suffering from migraine aphalgia, a seizure disorder, occipital neuralgia, colitis, anxiety-depression, and seasonal allergies.  Dr. Gilcrest reported that she was then taking Xanaflex, Migranol, and Imitrex and had tried a tens unit, occipital nerve blocks, Neurontin, Vicoprofen, Prozac, Elavil, Esgic, Imitrex injections, Sansert, and melatonin.  Accompanying clinical notes included complaints of daily headaches averaging an 8 on a 10-point pain scale. Tr. at 233, 236.

7

On May 10, 2004, Anton Freihofner, M.D., a state agency physician, reviewed Bolyard's record and opined that she could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and was unlimited in her ability to push or pull. Dr. Freihofner also opined that Bolyard could never balance; should avoid concentrated exposure to extremes of cold and heat and to hazards; and should avoid even moderate exposure to noise, vibration, and fumes, odors, dust, gases, and poor ventilation. In explaining Bolyard's limitations, Dr. Freifhofner wrote:

> Claimant has a mixed headache disorder with headaches due to migraines, tension, occipital neuralgia, myofascial pain, and rebound headaches. Headaches partly controlled with botox injections and Imitrex. She has been on most known treatment for migraines without much response and is felt to have a significant rebound headaches [sic]. She appears to have had seizures due to medication and dietary supplemental use. She developed ischemic colitis from medication. Despite her frequent headaches most observations in file do not suggest severe pain behavior or vomiting, but have shown some photophobia. She should avoid bright lights and sun and other known precipitants of migraines. She has an exertional precipitant and is given a light RFC. MRI, EEG, and neuro exams have been normal. She has mild cervical disc disease and some ectopic cerebellar tissue.

Tr. at 265-66.

Dr. Kriegler referred Bolyard to Zev S. Ashenberg, Ph.D., for an evaluation and recommendations. Tr. at 271-73. After interviewing Bolyard, Dr. Ashenberg reported that Bolyard had a history of migraines since age 12 and a family history of migraines on her father's side of the family. Bolyard described her headaches as a combination of migraine and tension headaches, averaging about 5 on a 10-point pain scale and ranging from 0-10 on the scale. The most severe headaches were accompanied by nausea and vomiting. Bolyard asserted that she was completely headache-free for only

8

about two hours a day.  Sun, over-activity, and positive or negative stress exacerbated her headaches.  Bolyard said she had trouble sleeping and averaged about six hours of interrupted sleep per night.  Her medication regime included Botox injections, Zanaflex, Topamax, Migronal, and Imitrex.  Bolyard estimated that the Botox injections helped reduce the severity of her headaches by about 20%.  She also suffered from depression and frustration resulting from her headaches.  Dr. Ashenberg found Bolyard to be lucid and coherent with no evidence of a thought disorder but depressed and having constricted affect.  Dr. Ashenberg diagnosed Bolyard as suffering from stress-related headaches and recommended that she undergo training in psychological pain and stress management techniques.  He believed that such training could help her through her day to day routine but that it might not help sufficiently to return her to employment.

Bolyard sought further treatment at the American Migraine Center from March 29, 2004 through October 18, 2006 for migraines and neck spasms.  Tr. at 259-61, 293-329.  Bolyard also reported depression, anxiety, and sleeplessness.  Tr. at 327-28.  Her medications during this period included Seroquel, Zanaflex, Allegra D, Claritin, nasal steroid spray, Ambien, Amoxicillen, Maxalt, Migranol, benadryl, baclofen, botox injections, Axert, Imitrex, Sudafed, Vicodin, and Topamax, and she reported that she had also tried biofeedback, accupuncture, and chiropractic treatment.  She was prescribed baclofen and Cymbalta for her muscle spasms and depression, but these were of no help.  Tr. at 322.  Bolyard continued to complain of daily headaches and menstrual headaches, although Botox injections provided some relief in frequency and intensity for about two months at a time.  Tr. at 295, 299-300, 303, 311, 317.  On at least one occasion, she complained of hallucinations due to lack of sleep.  Tr. at 319.

9

By October 18, 2006, Bolyard rated her daily headaches on average at 4 on a 10-point pain scale, with severity ranging from 2 at best to 10 at worst.  Tr. at 293, 295.  On the portion of the Toronto Western Spasmodic Torticollis Rating Scale[1] assessing the effects of her pain and spasms on daily activities, Bolyard rated herself at 18 on a scale from 0-30, with 0 being no difficulty performing the listed activities and 30 being unable to perform those activities.[2]  Tr. at 293.

On September 7, 2004, Dr. Gilcrest completed an assessment of Bolyard at the request of the Bureau.  Tr. at 274-78.  Dr. Gilcrest diagnosed Bolyard as suffering from migraine cephalgia, seizure disorder, occipital neuralgia, anxiety-depression, high cholesterol, seasonal allergies, headache secondary to muscle spasm, and a single occurence of schemic colitis in 2002.  He noted that Bolyard was taking Norflex, Topamax, Seroquel, Allegra D, Migranol, and Ambien and had been asked to consider osteopathic manipulation.  Clinical notes showed that Bolyard had complained of daily migraines accompanied by nausea, neck and shoulder pain, rhomboid spasm, and seizures from drug interactions.

B.  Hearing Testimony

At her hearing, Bolyard testified that she had been working most recently part-time for a chiropractor but had tapered off working as her health became worse, then quit completely in 1998.  Tr. at 360-63.  Before that, she had worked full-time as a financial aid officer at a school for court reporting.  Tr. at 363-64.  She left that job

---

[1]  The scale is  a measure of the effect of cervical dystonia on patients.

[2]  The listed activites were work, activities of daily living, driving, reading, watching television, and activities outside the home.

10

because stress was making her health worse.

Bolyard also testified that she suffers from headaches every day and headaches severe enough to force her to lie down a couple times a week.  Tr. at 366.  The bad headaches are accompanied by nausea, neck pain, and interfere with sleep.  Tr. at 366-67.  No medication or other treatment eliminates the headaches consistently, although some will relieve them temporarily or will eventually result in side effects that require discontinuation.  Tr. at 367-69, 372-73, 378.  Even injections of Demerol have proved insufficient to control her headaches consistently.  Tr. at 389-90.  The daily headaches average about 3-4 on a 10-point pain scale, and her bad headaches are 10 on a 10-point scale.  Tr. at 368, 379.  The headaches occur at completely unpredictable times.  Tr. at 368.  According to Bolyard, the number and severity of her headaches increase as her activity level increases.  Tr. at 392.  Bolyard also testified that stress and interacting with people also cause her to deteriorate.  Tr. at 392, 395.

On May 24, 2007, the ALJ sent Bolyard's attorney a letter asking for details about Bolyard's home schooling of her two children.  Tr. at 129.  Bolyard responded as follows:

> My sons, ages 13 and 15 are homeschooled through a co-op called CROWN Academy, which meets once per week.  On Fridays they attend classes in English, history, science and various electives, which are taught by different parents.  They turn in their work for the previous week and receive their assignments for the upcoming week.  In addition, they communicate with their teachers and classmates by phone or e-mail, if necessary, to discuss assignments and projects.
>
> My participation in the co-op is to grade homework for a history class with 8 students.  This is work that I can take home and complete at a time when my headaches are not interfering with my ability to read and concentrate.  Sometimes I am able to do this on Fridays, while the kids are attending classes.  Other time, like last week, for example, I have a bad week and am not able to get

11

the homework graded until 3 a.m. the night before co-op.  Fortunately, having a week between classes allows a great deal of flexibility.  This takes approximately 1-2 hours per week.

In addition to the co-op classes, math is taught at home.  My husband teaches algebra to our older son.  Our younger son watches his lessons on a DVD and then completes his homework.  I grade it and then may spend a few minutes going over problems that he has missed.  This takes approximately 5-10 minutes per day of my time.  We do not have a set time for this and do it at a time when I am feeling able.  If I'm having a "bad" day, we may skip a day.  This year we got behind and we have to work through a few weeks of the summer to get caught up in math.

For the rest of the week I am available to keep them on task, advise them, or to answer questions as needed.  However, on my "bad" days, I may be completely unavailable and we may need to play "catch up" on subsequent days.

We actually found that the flexibility afforded by homeschooling has been beneficial to our family in regard to my health issues.  We feel that the rigid structure of a school schedule would be very difficult to accommodate day in and day out, in particular because mornings tend to be my worst time of the day.  Because we homeschool, the boys are able to work independently at their own pace and on their own schedule, even if I must remain in bed for part of the day.  There is no pressure for me to get up and rush them to school every day, regardless of how I feel.

Tr. at 130-31.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

12

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second,  the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV.  Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1. The claimant met the disability insured-status requirements of the Act on May 2, 1997, her alleged disability onset date, and continued to meet them through June 2001, but not thereafter.

2. The claimant has not engaged in substantial gainful activity since her alleged disability onset date.

3. Prior to the expiration of the claimant's disability insured status at the end of June 2001, she had the following impairments that reduced her ability to perform basic work-related functions:  migraine headaches.

13

4.      The claimant's headache condition did not meet or equal the requirements of any impairment listed under 20 CFR Part 404, Subpart P, Appendix 1, prior to the expiration of her disability insured status at the end of June 2001.

5.      The claimant's subjective complaints are disproportionate with and not supported by the objective and substantial evidence in the record to the extent they suggest that she was disabled prior to the expiration of her disability insured status.

6.      Prior to the expiration of her disability insured status at the end of June 2001, she had the residual functional capacity (RFC) to perform light exertional work, subject to no climbing of ladders, ropes, or scaffolds, or more than frequent stooping, kneeling, crouching, crawling, or stair climbing.  She needed to avoid concentrated exposure to temperature extremes and hazards , and moderate exposure to noise, vibration and air pollutants.

7.      Prior to the expiration of her disability insured status at the end of June 2001, the claimant could do her part relevant work as a secretary/receptionist, as she actually performed it.

8.      The claimant was not under a disability, as defined in the Social Security Act and Regulations, prior to the expiration of her disability-insured status at the end of June 2001.

Tr. at 24.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a

14

preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also*

*Richardson v. Perales*, 402 U.S. 389 (1971).

VI.  Analysis

Bolyard claims the ALJ erred by (1) finding that Bolyard's home schooling efforts

required significant responsibilities from her; (2) finding Bolyard not credible; (3) ignoring

the side effects of Bolyard's medications; (4) not seeking the testimony of a medical

expert to assist in analyzing the severity of Bolyard's conditions and her credibility; (5)

not giving proper deference to the opinions of Bolyard's treating physicians; and (6) not

having a VE present at the hearing to opine in light of Bolyard's non-exertional

impairments.  The Commissioner responds that the ALJ's opinion is supported by

substantial evidence and should be affirmed.

A.     *Whether the ALJ erred by finding that Bolyard's home schooling required
       significant responsibilities from her*

In finding that Bolyard's activities were inconsistent with her alleged symptoms,

the ALJ wrote as follows:

> The claimant testified that she lives with her husband and two dependent
> children, ages 15 and 13, in a two-story house.  She said that she drives five
> times a week, coordinates teenage church volunteers two days a year, and does
> volunteer work for 20 to 30 hours a year.  She said that she took a bus trip to
> Boston in the past year.  She said that she drove one hour to the hearing without
> stopping.  In April 1999, she presented with "ear plugging" after taking diving
> lessons (Exhibit 15).  In December 2006. she reported that she reads for short
> periods, watches television, cooks, and cares for her children and pets (Exhibit
> 10E, p. 3).  Her level of activity is not consistent with the level and persistence of
> symptoms that she alleges.

> In June 2004, a psychologist mentioned that the claimant's children were home-
> schooled (Exhibit 53F, p. 4).  The claimant failed to mention this activity at the
> hearing in response to questioning about providing assistance to children or
> elderly relatives.  She also neglected to mention this specifically in a
> questionnaire completed in December 2006 (Exhibit 10E).  Post-hearing, I

15

requested an explanation concerning her home schooling activities.  The claimant responded that her sons are home-schooled through a co-op that meets once a week (Exhibit 11E).  She reported that she requires up to two hours a week to grade homework for a history class in the co-op with eight students.  She reported that she requires only five to ten minutes a day to grade her younger son's math homework and discuss the results with him.  She reported that she additionally is available throughout the week to keep her sons on task, advise them, and answer questions.  She described her participation in the home-schooling as minimal, indicating that it requires a total of only three hours a week.  However, she testified that her husband works fulltime, and a proper commitment to home-schooling would seem to require significant responsibilities of the at-home parent.  On the date she was last insured, her sons were much younger children (ages 7 and 9 in 2001) and would have required significant supervision if they were being schooled at home at that time.  Additionally, on the background questionnaire, she indicated that she also reads for short periods, watches television, cooks, and cares for her children and pets (Exhibit 10E, p. 3).  Her ability to successfully engage in home-schooling and other activities, even allowing for some of the flexibility she describes, is inconsistent with the frequency and intensity of the headaches she describes.  Furthermore, the treatment notes around the time of the expiration date of her insured status do not support the alleged frequency and intensity of her headaches.

Tr. at 22-23.

There are several problems with the ALJ's account.  First, contrary to the ALJ's assertion, the ALJ did *not* ask Bolyard at the hearing about providing assistance to children or elderly relatives.  Indeed, although the ALJ asked Bolyard some questions about traveling, he asked no questions about her daily activities.  Moreover, the ALJ's questioning of Bolyard closely controlled the subjects covered in the bulk of the hearing.  At no time during the hearing would a discussion of home schooling have been an appropriate response to the ALJ's questions.

Second, although Bolyard did not mention home schooling in responding to the Background Questionnaire, tr. at 122-24, Bolyard noted in response to the first question asking about her capabilities, "I am answering this question and the others for the days I have an uncontrolled migraine, or it is controlled but I am under the influence of pain

16

medication."  Tr. at 123.  Bolyard told the ALJ in her letter responding to his inquiry about home schooling that she avoided home schooling on her bad days.

Third, the ALJ's conclusion that "a proper commitment to home-schooling would seem to require significant responsibilities of the at-home parent," tr. at 23, comes in the face of the home schooling process as Bolyard describes it.  Rather than examining the particulars of the co-op, her husband's instruction of the older child, the use of math DVDs, Bolyard's responsibilities for grading and answering questions, and the admission that Bolyard is currently running behind schedule, the ALJ simply ignores these details in the record and reaches a conclusion based entirely upon personal belief.

Fourth, the ALJ's conclusion that Bolyard's "ability to successfully engage in home schooling and other activities, even allowing for some of the flexibility she describes, is inconsistent with the frequency and intensity of the headaches she describes," tr. at 23, ignores the record.  Bolyard has repeatedly said that she has 2-3 migraine headaches per week, lasting as little as two hours and as long as two days.  Roughly, this means that Bolyard averages about two and a half days per week when she is incapacitated.  Bolyard says that she does not do home schooling or engage in most other activities when she has a migraine.  The court fails to understand how Bolyard's activities as described, including home schooling, cannot be performed in the four and a half days per week that she is free of migraine headaches.

The ALJ's limited questions about Bolyard's day-to-day activities cannot be imputed to Bolyard as an attempt to conceal home schooling,  His conclusions regarding inconsistencies between Bolyard's activities, including home schooling, and

17

her alleged symptoms fail to grapple with the details of the record.  As the ALJ's conclusions in this respect ignore the record, they cannot be said to be supported by substantial evidence.

B.      *Whether the ALJ erred in finding Bolyard not to be credible*

The ALJ found that Bolyard's subjective complaints were "disproportionate with and not supported by the objective and substantial evidence in the record to the extent they suggest that she was disabled prior to the expiration of her disability insured status."  Tr. at 24.  The ALJ's discussion of inconsistencies between Bolyard's complaints and the evidence in the record consists largely of the ALJ's discussion of Bolyard's home schooling and other daily activities, as described *supra*.  The ALJ also noted, "The claimant's subjective complaints are disproportionate with and not supported by the objective and substantial evidence in the record.  I note that in June 2001, the last month the claimant was insured, she reported no weight change, weakness, or fatigue."  Tr. at 22 (citation omitted).  Bolyard objects that the ALJ's credibility finding is not supported by substantial evidence.

Determinations regarding the credibility of a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Secretary of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Secretary of Health and Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nevertheless,

> It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on

18

> credibility, supported by the evidence in the case record, and must be sufficiently
> specific to make clear to the individual and to any subsequent reviewers the
> weight the adjudicator gave to the individual's statements and the reasons for
> that weight.

Social Security Ruling 96-7p ("SSR 96-7p"), at *34484.

The Sixth Circuit in *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994), most clearly

stated the test which courts must use in reviewing the Commissioner's determinations

of the credibility of an applicant's statements about pain and disability.  The Court

reviewed the pertinent regulations at 20 C.F.R. § 404.1529 and summarized the

applicable test as follows:

> First, we examine whether there is objective medical evidence of an underlying
> medical condition.  If there is, we then examine: (1) whether objective medical
> evidence confirms the severity of the alleged pain arising from the condition; or
> (2)  whether the objectively established medical condition is of such a severity
> that it can reasonably be expected to produce the alleged disabling pain.

*Id.* at 1038-39 (quoting *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847,

853 (6th Cir. 1986)).  The Court specifically noted that the second part of this test is

satisfied if the plaintiff satisfies either alternative after finding objective evidence of an

underlying medical condition.  Thus, the test "does not require . . . 'objective evidence of

the pain itself.'"  *Felisky*, 35 F.3d at 39 (quoting Green v. Schweiker, 749 F.2d 1066,

1071 (3d Cir. 1984)) (footnote omitted).  The Court also summarized the factors that

should be considered in determining whether the established medical condition can

reasonably be expected to produced the alleged disabling pain:

> (i) Your daily activities . . .
> (ii) The location, duration, frequency, and intensity of your pain . . .
> (iii) Precipitating and aggravating factors . . .
> (iv) The type, dosage, effectiveness, and side effects of any medication you take
> or have taken to alleviate your pain or other symptoms . . .
> (v) Treatment, other than medication, you receive or have received for relief of

your pain . . .
(vi) Any measures you use or have used to relieve your pain . . .

*Felisky*, 35 F.3d at 1039-40.  The Court added that "the opinions and statements of the claimant's doctors" are also relevant to the Commissioner's and the reviewing court's determination.  *Id.* at 1040.

The ALJ found that Bolyard's migraine headaches were a severe impairment that reduced her ability to perform work-related functions.[3]  Having so found, his task was to proceed to the second step of the *Felisky* analysis.  Because objective medical evidence is unable to confirm the alleged pain arising from a migraine in cases such as Bolyard's, the ALJ needed to determine whether Bolyard's migraines were of such a severity that they could reasonably be expected to produce the disabling pain she alleged.  In performing this analysis, the ALJ relied almost entirely on Bolyard's daily activities.  As already discussed, the ALJ failed to analyze properly the details of those activities in light of precise nature of Bolyard's alleged disabling pain and reached conclusions that did not rest on the record.

The ALJ's discussion of Bolyard's credibility did not examine the location, duration, frequency, and intensity of her alleged pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication Bolyard took to alleviate her pain; treatment, other than medication, she received for relief of pain; or

_____

[3]  The ALJ did not specifically identify Bolyard's migraines as a "severe impairment." However, because the ALJ reached the determination that Bolyard suffered from migraine headaches in the section of his decision entitled "Step 2 - Severe Impairments" and because immediately after determining that Bolyard suffered from migraine headaches he added, "The evidence does not establish other severe impairments," the conclusion that the ALJ determined Bolyard's migraines to be a severe impairment is inescapable.

any measures she used to relieve her pain.  The ALJ reviewed some of the medications

Bolyard has taken for her headaches and some of the side effects of those medications.

His review was cursory and highly selective, and he did not refer to it in his analysis of

Bolyard's credibility.

Bolyard described her migraine headaches as arising on one side of the head or

the other and developing into a whole head headache or as arising behind one eye.

She alleges that they occur 2-3 times per week, last a couple hours to a couple days,

and are an 8-10 on a 10-point pain scale.  Bolyard described her migraines as

associated with her period, exercise, positive or negative stress, alcohol, odors,

cigarette smoke, temperature changes, and bright lights, especially sunlight.  She also

said they were accompanied by photophobia, osmophobia, nausea, vomiting, and

sleeplessness and that they moderately to severely impact her home activities and job

performance.  The ALJ failed to note most of these statements in the record and did not

refer to any of these statements in assessing Bolyard's credibility.

Bolyard has taken, at one time or another, the following medications for her

headaches:  Anaprox, Tylenol with codeine, Sinequan, Indocin, Toroidal, Cafergot,

Fiorinal, Fiorinal with codeine, Relafen, Sansert, Skelexin, Imitrex orally and by injection,

Prozac, Ultram, Amitriptyline, beta blockers, calcium channel blockers, DHE 45,

Depakote, Esgic, Pamelor, Topomax, Alegra, Migronal, Xanaflex, Neurontin,

Vicoprofen, Seroquel, Norflex, Botox injections, and Demerol injections.  She has

undergone a series of ten occipital nerve blocks administered every two to three weeks

and trigger point injections.  She has also tried a tens unit, biofeedback, accupuncture,

massage, and chiropractic treatment.  The ALJ failed to note most of this information in

21

the record and did not refer to any of it in assessing Bolyard's credibility.

Bolyard's medications and other treatments have apparently had limited success in alleviating her symptoms.  According to Bolyard, some medications have proved ineffective; others have proved effective for a limited time; others have caused debilitating symptoms; and still others are somewhat effective on many, but not all, occasions.  The side effects of her medications have included drowsiness, forgetfulness, an inability to concentrate, irritability, weight gain, ischemic colitis, grand mal seizures, and drug-induced rebound headaches.  The ALJ noted most, but not all, of these facts in the record and did not refer to any of these facts in assessing Bolyard's credibility.

Finally, no treating source has expressed any reservations about whether Bolyard's headaches are genuine or less severe than she alleges or expressed any concern that Bolyard is malingering or exaggerating her symptoms to obtain drugs.[4]  Surely such facts are more relevant to the credibility of Bolyard's allegation that she is disabled by headache pain than whether Bolyard reported weight change, weakness, or fatigue in June 2001.

The ALJ's analysis of Bolyard's credibility was based on an inaccurate and incomplete statement of the relevant facts in the record and failed to engage most of the factors required by the Regulations and the Sixth Circuit in assessing credibility.  The ALJ's opinion regarding Bolyard's credibility, therefore, cannot be said to be supported by substantial evidence.

---

[4] Indeed, the ALJ noted at the hearing that Bolyard's treating sources believed that her alleged symptoms were real rather than psychosomatic.  *See* Tr, at 383.

22

C.     *Whether the ALJ erred in ignoring the side effects of Bolyard's medications in assessing Bolyard's credibility*

Bolyard contends that the ALJ erred in not considering the side effects of her medications when assessing her credibility.  The Commissioner replies that the ALJ considered Bolyard's reported medication side effects in his decision and accommodated them in his RFC finding.

The Commissioner's reply is wanting in two respects.  First, as already noted, the ALJ did not include all the side effects of Bolyard's medications in his decision.  Second, Bolyard's contention is that the ALJ failed to consider the side effects of her medications in his assessment of her credibility, not that the ALJ failed to include them in his determination of Bolyard's non-exertional limitations.

As already discussed, the ALJ did not refer to the side effects of Bolyard's medications in making his assessment of her credibility.  This is one reason, among others, why the ALJ's assessment of Bolyard's credibility is not supported by substantial evidence.

D.     *Whether the ALJ erred in not seeking the testimony of a medical expert*

Bolyard argues that the ALJ erred in failing to solicit the testimony of a medical expert regarding the severity of Bolyard's symptoms.  The Commissioner responds that the decision of the ALJ whether to solicit a medical expert's testimony is discretionary and that the ALJ did not abuse his discretion.

The Commissioner correctly notes that a decision to solicit the opinion of a medical expert is within the ALJ's discretion:  "Administrative law judges may . . . ask for and consider opinions from medical experts on the nature and severity of you

impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart."  20 C.F.R. § 404.1527(f)(2)(iii).  In the instant case, the ALJ gave no indication that he had difficulty understanding the nature of migraine headaches or that he doubted they could produce the symptoms that Bolyard alleged.  In fact, the ALJ observed at the hearing that migraine headaches could cause the pain symptoms that Bolyard described.  Tr. at 386.  Rather, the ALJ's problem was whether to believe that Bolyard indeed suffered from the pain she alleged.  As the ALJ stated at the hearing, "[T]his is all going to come down to whether or not I accept what the claimant's saying . . . ."  Tr. at 387.  As the ALJ apparently understood the nature of Bolyard's condition and agreed that it could produce the symptoms she alleged, the court cannot say that the ALJ's failure to solicit the testimony of a medical expert was an abuse of discretion.  Bolyard's argument to the contrary is not well-taken.

E.      *Whether the ALJ erred by failing to give proper deference to the opinions of Bolyard's treating physicians*

Bolyard contends that the ALJ erred in failing to give proper weight to the opinions of her treating physician.  In particular, Bolyard argues that Dr. Shapiro's opinion at "Exhibit 21 (Tr. 168) documents the claimant's problems of headaches and nausea and vomiting for more than just a short period of time and the inference is clear that the claimant could not sustain work given these types of conditions."  Plaintiff's brief at 17.  The Commissioner responds that the cited document does not contain a medical opinion and that no treating physician's opinion contradicted the state agency physician's opinion adopted by the ALJ .

The medical opinion of treating physicians should be given greater weight than

24

those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions.  20 C.F.R. § 404.1527(a)(2).

To the extent that Dr. Shapiro describes the nature of Bolyard's ailment and its symptoms, he is expressing an opinion.  The Commissioner's objection that the description of Bolyard's ailment and symptomology is based solely on Bolyard's subjective statements does not alter the fact that the description is, nevertheless, an opinion.  The lack of objective data to support the opinion goes to the weight that the ALJ must accord the opinion.

There is nothing in the ALJ's decision, however, that contradicts Dr. Shapiro's description of the nature of Bolyard's ailment and her symptoms.  The ALJ accepted that Bolyard had more than one type of headache, that the migraines were accompanied by nausea and vomiting, and that this had been a long-term problem. Bolyard's contention that Dr. Shapiro implies that she could not sustain work is simply wrong.  Dr. Shapiro opined that a great deal of Bolyard's problem was the result of over-medication, and he advised that she wean herself from unnecessary medications by undergoing treatment with Dr. Moshe Torem.  The inference to be drawn from Dr. Shapiro, therefore, is that Bolyard's problems are treatable, not that she is unable to work.

Finally, as the Commissioner correctly notes, the state agency physician's opinion adopted by the ALJ is the only medical opinion that assesses Bolyard's

25

functional capacity.  It cannot be said, therefore, that by adopting the state agency physician opinion in this respect that the ALJ failed to give due deference to the opinion's of Bolyard's treating physicians.

Bolyard does not cite an opinion of a treating physician to which the ALJ failed to give proper deference.  For this reason, her argument that the ALJ failed to give due deference to the opinions of her treating physicians is not well-taken.

F.      *Whether the ALJ erred in not having a VE present*

Bolyard argues that because she had non-extertional limitations, the ALJ was required to consult a VE to determine whether she could perform work in the national economy.  The Commissioner replies that the ALJ is required to consult a VE only at the fifth stage of a disability analysis.  As the ALJ's decision stopped at stage four, the Commissioner contends, there was no need to consult a VE.

Although an ALJ may consult a VE at stage four of a disability determination, the use of a VE is not required at that stage.  *See* 20 C.F.R. § 404.1560(b).  Bolyard's citation of *Abbott v. Sullivan*, 905 F.2d 918 (6th Cir. 1990), is unavailing, as the ALJ in *Abbott* consulted a VE at the fifth stage of the disability analysis.  Because the ALJ ended his decision at the fourth stage of the disability analysis, it was not error for him to decline to consult a VE.  The court expresses no opinion as to whether a VE should be consulted upon remand.

VII.  Decision

For the foregoing reasons, the Court VACATES the decision of the Commissioner and REMANDS the case for further proceedings consistent with this opinion.  In particular, the ALJ must analyze Bolyard's daily activities, particularly her

26

home schooling, based on the facts in the record in determining her RFC.  The ALJ

must also perform a proper, complete, and record-based analysis in assessing

Bolyard's credibility.

      IT IS SO ORDERED.


                                           <u>s/ Nancy A. Vecchiarelli</u>
                                           U.S. Magistrate Judge

Date: March 26, 2008